**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3661
_____

JOHN W. WOJCIECHOWSKI;
ANNE DALVET, Co-Administrators for the Estate of
Eleanor S. Murphy

v.

MARLENE MUSIAL; MELINDA CUPPLES;
WILLIAM CUPPLES,
                    Appellants

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-17-cv-00655)
District Judge: Honorable James M. Munley
_____

Submitted under Third Circuit L.A.R. 34.1(a)
October 1, 2020
_____

Before: SHWARTZ, PHIPPS, and FISHER, <u>Circuit Judges</u>.

(Filed: October 8, 2020)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

SHWARTZ, Circuit Judge.

After Eleanor Murphy's death, a friend and family members went to her home to search for a will and valuables. Several items were removed, including boxes of cash. Murphy's nephew John Wojciechowski and friend Anne Dalvet ("Plaintiffs") claim that Murphy's niece Marlene Musial and Musial's daughter and son-in-law, Melinda and William Cupples ("Defendants"), took cash from the boxes for themselves, rather than depositing it into the estate's bank account. Plaintiffs sued Defendants for fraud and conversion and offered an expert witness to estimate the amount of cash in the boxes. Defendants moved in limine to exclude the expert's testimony for a lack of reliable methodology, and the District Court denied the motion. Because the District Court did not clearly err in concluding that the expert used a reliable methodology, we will affirm the order admitting his testimony.

I

The issue is this case is whether Plaintiffs' expert should have been permitted to provide an opinion about the amount of cash contained in two metal boxes Musial, the Cuppleses, and Dalvet found when they searched Murphy's home. Dalvet observed that the first box was filled to capacity with mostly $20 and $50 bills, and the second box was filled to capacity with $1, $20, and $50 bills, some wrapped in newspaper.[1] Musial took the boxes as well as cans of coins and a curio cabinet.

---

[1] The night they searched the home, Musial called Dalvet and told her that there was $5,000 in the boxes. One week later, Musial informed Dalvet that there was actually $55,000 in the boxes, but Dalvet estimated that the boxes contained about $150,000.

Months later, Dalvet and Musial were appointed co-administrators of Murphy's estate. In accordance with her duties, Dalvet informed the estate's lawyer about the cash Musial took. The lawyer threatened to report Musial to law enforcement if she did not deposit the cash into the estate account. Musial deposited $60,299 into the estate account a few days later. Wojciechowski thereafter replaced Musial as co-administrator of the estate.

Plaintiffs filed a complaint alleging (1) conversion against Defendants and (2) fraud against Musial. Plaintiffs hired certified fraud examiner Nathan Lipton to estimate the amount of cash contained in the boxes.

Lipton (1) estimated the total cash that could be contained in the boxes, (2) considered Dalvet's descriptions of the contents of each box, and (3) evaluated whether Musial's deposit would have filled the boxes to their capacities. For the first task, Lipton applied established mathematical principles to calculate the volume of each box and consulted with law enforcement agencies regarding the dimensions of United States currency. He determined that the first box could hold 4,886 bills and the second box could hold 9,109 bills.[2] Based on those numbers, Lipton opined that, conservatively, (1) if the boxes contained a mix of $10, $20, and $50 bills, the cash would total $373,160[3]; (2) if the boxes contained all $10 bills, the cash would total $139,950; and

---

[2] When measuring the boxes' volumes, Lipton used a "conservative approach" to account for compression of bills, condition of currency, and the presence of newspaper, bank envelopes, and a powdery substance that Lipton observed inside the boxes.

[3] Plaintiffs asked Lipton to assume that the boxes contained one-third of each denomination.

(3) if the boxes contained all $20 bills, the cash would total $279,900.[4]  Based on his test

concerning the number of bills that would fit in each box, Lipton concluded that the

boxes fit many more bills than the number Musial deposited.

Defendants moved to preclude Lipton's testimony pursuant to Federal Rule of

Evidence 702.  The District Court denied the motion because (1) Lipton used an

acceptable methodology; (2) Lipton considered Dalvet's observations of the contents of

the boxes; (3) Lipton's report set forth the basis for his conclusion that the boxes

contained between $139,950 and $373,160 depending upon the denomination of the bills;

and (4) Defendants could address any weaknesses in his method or conclusion through

"vigorous cross-examination and argument to the jury."  Wojciechowski v. Musial, No.

3:17-cv-655, 2019 WL 2296599, at *3 (M.D. Pa. May 30, 2019).

The case proceeded to trial.  The jury heard from Dalvet about her observations

concerning the contents of the boxes and testimony about other items Defendants

removed,[5] as well as Lipton's testimony.  The jury returned a verdict against Defendants

totaling $275,000.  Defendants appeal.

---

[4] Lipton noted that he would consider a possible standard deviation of plus or minus five percent of the overall amounts.

[5] Dalvet and Lipton's testimony was consistent with their affirmation and expert report, respectively.  Other witnesses testified about items that Defendants took from Murphy's home.  For example, Wojciechowski testified that Musial took cans of coins and a curio cabinet containing Murphy's belongings.  Dalvet testified that Musial took fifteen to twenty cans of coins.  Melinda Cupples testified that Musial took three or four containers of coins, a curio cabinet, and a hallway mirror table.  Musial testified that she took only two cans of coins and a curio cabinet.

II[6]

The sole issue is whether the District Court abused its discretion in admitting Lipton's expert opinion. Federal Rule of Evidence 702 requires a district court to consider three restrictions on the admission of expert testimony: "qualifications, reliability, and fit." Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 80 (3d Cir. 2017) (citation omitted).

The parties dispute only the reliability of Lipton's opinion. "The standard for reliability is not that high." Id. at 81 (internal quotation marks and citation omitted). Reliability does not require that the opinion be supported by the best foundation, methodology, or research. Id. Instead, expert testimony is reliable when it rests on "good grounds."[7] Id. at 83 (citation omitted).

Lipton's opinion was reliable. First, he measured the cubic capacity of each box, and no party challenged the accuracy of this measurement. Second, Lipton consulted

---

[6] The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. By filing a motion in limine, Defendants preserved their objection to the expert's testimony for appellate review. Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc., 181 F.3d 446, 455 (3d Cir. 1999). "We review a district court's decision to admit expert testimony for abuse of discretion and exercise plenary review over a district court's legal interpretation of Rule 702 of the Federal Rules of Evidence." Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 81 (3d Cir. 2017) (citation omitted). "An abuse of discretion arises when the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (citation omitted).

[7] To determine whether an expert's methodology is reliable, courts should consider, among other factors, "whether the method has been subject to peer review; . . . the existence and maintenance of standards controlling the technique's operation; . . . [and] the qualifications of the expert witness testifying." Pineda, 520 F.3d at 247-48.

with law enforcement about the dimensions of United States currency. Third, Lipton accounted for the differences between new currency and currency that had been in circulation as this impacts the amount of space a bill occupies. Fourth, Lipton considered a standard deviation and applied a conservative valuation approach to account for potential errors and "control[] the technique's operation." Pineda, 520 F.3d at 247-48. Finally, as a certified fraud examiner, Lipton had the "qualifications" to perform forensic accounting services. See Karlo, 849 F.3d at 80. By examining the boxes' storage capacities and the standard dimensions of currency, and by considering Dalvet's observations and evaluating Musial's deposit slip, Lipton rested his conclusions on good grounds. Moreover, the District Court properly noted that Defendants' questions about the reliability of his opinion could be tested through cross-examination. See id.

Although Lipton did not know the precise denominations or amounts of currency in the boxes, whether the bills were wrapped in newspaper, whether the bills had been circulated, or whether Dalvet's observations were reliable, these concerns go to the weight of the evidence, not its admissibility. Leonard v. Semtech Int'l Inc., 834 F.3d 376, 391 (3d Cir. 2016) (citation omitted). Furthermore, while Lipton lacked knowledge about Murphy's financial background, his conclusions need not be based upon the best foundation or research. Karlo, 849 F.3d at 81. Because Lipton had good grounds for his opinions, and Defendants had an opportunity to challenge those opinions, the District Court acted within its discretion in admitting Lipton's testimony.

## III

For the foregoing reasons, we will affirm the District Court's order denying Defendants' motion to preclude Lipton's testimony.