**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2997
_____

ALICIA A. COHEN

v.

RONALD A. COHEN,
a/k/a Rafi Cohen
a/ka Rafael Cohen
a/k/a Rafa-El Cohen
a/k/a Rafael Chaim Ha Cohen
a/k/a Rafael Chaim Cohen
a/k/a Ron Cohen
a/k/a Ronnie Cohen,

Ronald A. Cohen,
Appellant

_____

On Appeal from the United States District Court for the
District of Delaware
(D.C. Civil No. 1:19-cv-01219)
District Judge: Honorable Maryellen Noreika
_____

Argued July 30, 2024

Before: KRAUSE, RESTREPO, and MATEY, *Circuit Judges*

(Filed: January 8, 2025)
_____

Steven L. Caponi
Matthew B. Goeller
K&L Gates
600 N King Street, Suite 901

Wilmington, DE 19801

David R. Fine **[ARGUED]**
Amy L. Groff
K&L Gates
17 N Second Street, 18th Floor
Harrisburg, PA 17101
        *Counsel for Appellee*

Ronald A. Cohen
Apartment 204
2171 Britton Road
Leland, NC 28451
        *Pro Se Appellant*

Stephen A. Fogdall **[ARGUED]**
Dilworth Paxson
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
        *Court Appointed Amicus Curiae*

_____

OPINION OF THE COURT
_____

MATEY, *Circuit Judge*.

A woman sued her father alleging childhood sexual abuse and supported her claims with expert testimony describing the accuracy of "recovered" memories. Because the District Court abused its discretion by failing to analyze the expert's qualifications and committed harmful error in admitting his testimony, we will vacate the judgment.

**I.**

Alicia A. Cohen alleged that her father, Ronald A. Cohen, began sexually abusing her at the age of three. The alleged attacks stopped in 1992, and by 1995, Ms. Cohen no longer recalled the abuse. Eighteen years later, Ms. Cohen "[g]radually" developed "confusing" memories about her childhood. App. 1354, 1455. Ms. Cohen "live[d] in the same

area [where she] was abused" and would experience "emotional sensations and physical sensations" as she was "going about the community." App. 1354. She would then "try to figure out how to make sense of" these "jumbled up" memories. App. 1354. Eventually, her recollections crystalized into the allegations she filed against Mr. Cohen six years later for human trafficking, sexual abuse, assault, emotional distress, false imprisonment, and incest under federal and state law. She asserted that her claims were timely because she "repressed her thoughts and memories of" the abuse. App. 148.

In preparation for trial, Mr. Cohen designated Dr. Deryn Strange as an expert to testify on human memory. Dr. Strange explained in her report that "normal human memory is a reconstructive process" in which memories can be altered when individuals "incorporate other details into our memory that we did not see or experience." App. 319–20. According to Dr. Strange, there is "no scientific support" for the theory that "trauma victims can repress and then later recover memory for trauma" containing "all the clarity and detail of the original experience." App. 325–26. Based on her review of discovery materials, Dr. Strange concluded that Ms. Cohen "created false memories of abuse." App. 343.

Ms. Cohen designated Dr. James Hopper to respond, because, according to Dr. Hopper, while "*memories generally fade*," individuals "typically remember the *gist* of what happened and some of the most central details." App. 291–92. And "the *phenomena* of what are known colloquially as 'repressed' and 'recovered' memories are well-established facts," as shown by the inclusion of "dissociative amnesia" in "the field of psychiatry's 'diagnostic bible,' the *Diagnostic and Statistical Manual*" ("DSM"). App. 295. Dr. Hopper stressed that "there is no evidence that recovered memories are less accurate than continuous memories, but there *is* evidence for no difference in accuracy." App. 296.

Mr. Cohen moved to exclude Dr. Hopper's expert report and testimony, arguing in part "that repressed memory is no longer a generally accepted theory among the current scientific community." App. 272. He also argued that Dr. Hopper's theory of repressed memory "undermines . . . the idea that someone could completely suppress *all* memory of sex abuse

for any extended period of time," as Ms. Cohen claimed. App. 277. After a hearing, the District Court granted the motion in part and denied it in part.[1] Resolving to "put [Drs. Strange and Hopper] on the same level," the District Court concluded that if Dr. Strange testified "that repressed memories aren't real," Dr. Hopper could "say sometimes they are." App. 31–32.

At trial, Mr. Cohen's counsel "object[ed] to the qualification [of Dr. Hopper] as an expert witness." App. 1622. But the District Court "qualif[ied] him as an expert," reasoning that these objections went "more to credibility than to his expertise." App. 1622. Dr. Hopper then testified that children who suffer abuse will repress memories "because to relive [them] is going to evoke emotions that are going to make it harder for [the victim] to connect with and survive with the caregiver." App. 1641. He also testified that "freely recall[ed]" memories, which occur when an individual is asked "what do you remember about [a particular] experience," are "85 to 95 percent accurate." App. 1652. Dr. Hopper contrasted this form of memory recovery with "research [that] boils down to lying to people and forcing them to answer questions about things they don't remember." App. 1651–52. During closing argument, Ms. Cohen's counsel reminded the jury that even if Ms. Cohen was "mistaken in some of the details," Dr. Hopper had testified that "the central details of what happened, are . . . maybe as much as 90 percent accura[te]." App. 1699–700.

The jury returned a mixed verdict, finding for Ms. Cohen on five state law counts and awarding her $1.5 million in compensatory and punitive damages. Mr. Cohen, proceeding pro se, appealed the District Court's final judgment, and we appointed amicus counsel on his behalf.

---

[1] During the hearing, the District Court also ruled on Mr. Cohen's motions to exclude the reports and testimony of Ms. Cohen's experts on child abuse and human trafficking and her treating physicians' testimony, as well as Ms. Cohen's motion to partially exclude Dr. Strange's report and testimony.

Seeing prejudicial error in the District Court's decision, we will vacate and remand.[2]

## II.

Rule 702 contains "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit."[3] *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). District courts are tasked with a "rigorous gatekeeping function," *id.* at 744, to ensure that 1) the expert is qualified; 2) the proposed testimony is reliable and concerns matters requiring scientific, technical, or specialized knowledge; and 3) the expert's testimony is "sufficiently tied to the facts of the case," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)), so that it "fit[s]" the dispute and "will assist the trier of fact," *id. See UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020).

This gatekeeping function is necessarily "flexible," *Daubert*, 509 U.S. at 594, granting district courts "latitude in deciding *how*" these requirements are met, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Such "discretionary

---

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1367 and we have jurisdiction under 28 U.S.C. § 1291. We review the District Court's decision to admit expert testimony for an abuse of discretion, *United States v. Williams*, 974 F.3d 320, 358 (3d Cir. 2020), and will reverse if there "is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors," *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *In re TMI Litig.*, 193 F.3d 613, 666 (3d Cir. 1999), *amended by* 199 F.3d 158 (2000)). Upon a finding of abuse, "we review de novo whether that error was prejudicial or harmless." *United States v. Schneider*, 801 F.3d 186, 200 (3d Cir. 2015). Otherwise, we exercise plenary review over the District Court's legal interpretation of Federal Rule of Evidence 702. *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017).

[3] Like the District Court, we apply the version of Rule 702 in force at the time of trial.

authority" permits a district court to "decide whether or when special briefing or other proceedings are needed to investigate reliability." *Kumho Tire Co.*, 526 U.S. at 152. True, a district court "may conditionally admit the expert testimony subject to a later Rule 702 determination." *UGI Sunbury*, 949 F.3d at 833. But this leeway "is not discretion to abandon the gatekeeping function" or "perform the function inadequately." *Kumho Tire*, 526 U.S. at 158–59 (Scalia, J., concurring).

Although a district court has "an independent obligation to reach a decision upon a record that had been adequately developed," *Oddi v. Ford Motor Co.*, 234 F.3d 136, 153 (3d Cir. 2000), the flexible nature of this framework allows district courts to issue rulings absent formal findings of fact when working from an extensive record, *see, e.g.*, *United States v. Mitchell*, 365 F.3d 215, 233–34 (3d Cir. 2004) (explaining that the absence of factual findings did not require a different standard of review where the district court "assessed extensive live testimony" over a five-day *Daubert* hearing); *Oddi*, 234 F.3d at 153–55 (concluding that a *Daubert* hearing was not required because "the evidentiary record . . . was far from scant" and included "depositions and affidavits of the plaintiff's experts"). But a district court should still "take into account all of the" *Daubert* factors. *In re Paoli R.R. Yard PCB Litig.* (*Paoli II*), 35 F.3d 717, 742 (3d Cir. 1994). And absent "a developed record," a "district court's decision is wanting" if "it did not make explicit enough findings." *In re Paoli R.R. Yard PCB Litig.* (*Paoli I*), 916 F.2d 829, 858 (3d Cir. 1990);[4] *see UGI Sunbury*, 949 F.3d at 833; *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417–18 (3d Cir. 1999).

The District Court's process fell short of the rigor required by *Daubert* and Rule 702.[5] The Court dispatched four

[4] Although decided before *Daubert*, *Paoli I* applied Rule 702 as explained in *Downing*, which "remains good law." *United States v. Brownlee*, 454 F.3d 131, 142 n.10 (3d Cir. 2006).

[5] Ms. Cohen claims that Mr. Cohen "waived or forfeited . . . the *Daubert* objections now being made" because his motion focused on "Dr. Hopper's alleged endorsement of the theory of 'repressed memory.'" Amicus Response Br. 26–27.

*Daubert* motions in a single hearing that lasted just over an hour, with less than thirty minutes devoted to the combined discussion of Drs. Strange and Hopper. The short attention on Dr. Hopper centered on how his testimony would respond to Dr. Strange. There was no engagement with the arguments raised by Mr. Cohen in his *Daubert* motion as to the reliability and fit of Dr. Hopper's testimony. Instead, the District Court chose to "put [Drs. Strange and Hopper] on the same level" so that if Dr. Strange testified "that repressed memories aren't real," Dr. Hopper could "say sometimes they are." App. 31–32.

Ms. Cohen contends that the District Court cannot be faulted for defaulting to a level playing field, arguing it applies our "parity principle." Amicus Response Br. 45–46 (quoting *Mitchell*, 365 F.3d at 247). Not so. True, "[i]f one side can offer expert testimony, the other side may offer expert testimony on the same subject to undermine it." *Mitchell*, 365 F.3d at 247; *see id.* at 247–51 (explaining and applying the parity principle announced in *United States v. Velasquez*, 64 F.3d 844, 852 (3d Cir. 1995)). But this is not an alternate path past *Daubert*'s gate, as the proponent of the testimony must still be "offering a qualified expert with good grounds to support his criticism." *Id.* at 247. A district court's gatekeeping responsibilities are not negated by the existence of an opposing expert, nor can a district court delegate its duty to the parties.

The District Court's assumption that "if we're talking about the repressed memories" then "the rules should apply to both" Drs. Strange and Hopper, without first evaluating their independent qualifications, is unsupported by the text of Rule 702 or our caselaw. App. 19. By "sidestepping Rule 702 altogether and declining to perform any assessment of" Dr. Hopper and his testimony independent from that of Dr. Strange, "the District Court ignored the rule's clear

But Mr. Cohen's *Daubert* motion argued that Dr. Hopper's testimony fell short of the reliability and fit requirements. And after conducting voir dire before the jury, Mr. Cohen's counsel "object[ed] to the qualification [of Dr. Hopper] as an expert witness." App. 1622. These questions are accordingly preserved for our review.

mandate." *UGI Sunbury*, 949 F.3d at 833. Accordingly, the District Court improperly qualified Dr. Hopper as an expert.

## III.

Applying the gatekeeping requirements required for expert testimony, we conclude that Dr. Hopper's testimony lacked both the reliability and fit required under Rule 702.[6] We address each of these requirements in turn.

## A.

*Daubert*'s reliability requirement ensures that an expert's testimony is "based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80–81 (3d Cir. 2017) (quoting *In re TMI Litig.*, 193 F.3d 613, 704 (3d Cir. 1999), *amended by* 199 F.3d 158 (2000)). But admissibility does not hinge on "whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *Id.* at 81 (quoting *In re TMI Litig.*, 193 F.3d at 665). The court instead "looks to whether the expert's testimony is supported by 'good grounds.'" *UGI Sunbury*, 949 F.3d at 834 (quoting *Karlo*, 849 F.3d at 81). This inquiry "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (alteration in original) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)).

While there is no "definitive checklist or test," *Daubert*, 509 U.S. at 593, "good grounds" supporting an expert's testimony include:

(1) whether a method consists of a testable hypothesis;
(2) whether the method has been subject to peer review;

---

[6] Mr. Cohen also contends that Dr. Hopper was unqualified to render an expert opinion. Because our analysis rests on factors other than Dr. Hopper's qualifications, we need not decide whether Dr. Hopper was qualified to serve as an expert.

(3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*UGI Sunbury*, 949 F.3d at 834 (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247–48 (3d Cir. 2008)). Although no single factor "is dispositive, some analysis of these factors is necessary." *Id*. The District Court did not mention these factors, let alone engage with them. Applying them now, we conclude that Dr. Hopper's testimony is unsupported by "good grounds."

Consider Dr. Hopper's report, in which he points to the DSM's inclusion of "dissociative amnesia" as evidence that "'repressed' and 'recovered' memories are well-established facts." App. 295. As Dr. Hopper explained, dissociative amnesia is the "inability to remember important biographical information, auto[-]biographical information, usually of a stressful or traumatic nature that is inconsistent with ordinary forgetting." App 1645–46. But general acceptance of dissociative amnesia does not establish the same with respect to the accuracy of recovered memories. For "if one argued that the inclusion of dissociative amnesia in [the DSM] demonstrated acceptance of repressed memory, it would be analogous to saying that by recognizing the diagnosis of 'hoofed mammals,' one was demonstrating the acceptance of unicorns."[7]

Also without basis is Dr. Hopper's claim that "there is no evidence that recovered memories are less accurate than continuous memories, but there *is* evidence for no difference in accuracy." App. 296. For support, he cited two almost thirty-year-old studies. The 1995 study outlined preliminary evidence to suggest that recovered memories are as consistent as continuous memories when the victim reported the abuse in

---

[7] 2 David L. Faigman et al., Modern Scientific Evidence: The Law and Science of Expert Testimony § 19:22 (2024–2025 ed.).

9

childhood and afterward underwent a physical examination.[8] But it is unclear when and to what degree Ms. Cohen reported her abuse, and there is no record of a contemporaneous physical examination. The 1996 study found that the same percentage of continuous and recovered memories of abuse had at least one piece of evidence to support their accuracy.[9] And while "experts commonly extrapolate from existing data," here "there is simply too great an analytical gap between [these studies] and the opinion proffered" by Dr. Hopper that recovered memories are just as accurate as continuous memories. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

---

[8] This study consisted of 129 women who experienced childhood sexual abuse and reported the abuse in childhood, at which time they were physically examined by a medical provider. Eighty of those women recalled the abuse when interviewed seventeen years later. Seventy-five of those women were asked additional questions, and twelve women from that sample, or 16%, recalled experiencing "a time when they did not remember that [the abuse] had happened to them." Add. 8. The study found that "the women with recovered memories had no more inconsistencies in their accounts than did the women who always remembered," Add. 12, but warned that "[c]hildren who never reported may have a different pattern of remembering and forgetting the abuse," Add. 21. The author speculated that "accurate recovered memories may be more likely in this sample" because each participant's "abuse was reported in childhood" so that "[w]hen memories began to resurface, these women may have found it easier to retrieve an accurate account of the incident." Add. 21.

[9] This study involved seventeen women who, while in therapy with the author, reported continuous and recovered memories of abuse perpetrated by their fathers. Each memory of abuse was broken into constituent facts, and the patients and fathers gathered evidence to confirm the memories. A six-person panel reviewed the evidence and rated it for accuracy. The author concluded that "[o]f those memories for which some evidence was submitted," "74.6% of continuous and 74.7% of recovered memories were judged by the full set of raters as having at least one piece of" supporting evidence. Add. 42.

The probative value of these studies is further weakened by their relatively small sample sizes. Though there is no one-size-fits-all for study sizes under *Daubert*'s reliability prong, *see Mitchell*, 365 F.3d at 236 n.16 (explaining that a sample of 50,000 fingerprints, which is "quite large, and doubtless would be adequate in many if not most circumstances," may not be sufficient "out of about 60 billion in the world"), the seventeen-person sample in the 1996 study is insufficient.[10] Indeed, the author of the 1995 study, which was more than seven times the size of the 1996 study, cautioned that its "statistical analyses must be considered preliminary" because the study "relied on a small sample." Add. 21.

Nor is Dr. Hopper's testimony that "research over and over again shows that" memories "freely recall[ed]" are "85 to 95 percent accurate" substantially supported by the research he cited.[11] App. 1652. Dr. Hopper did not elaborate on the "research" underpinning his conclusory statement. And despite Ms. Cohen's efforts to identify studies supporting this claim, Dr. Hopper cited none of them in his report and therefore cannot be credited with relying on them.

Taken together, Dr. Hopper's testimony was unsupported by "good grounds" that would demonstrate reliability.

---

[10] This study's use of an "intra-subject approach," in which the accuracy of a participant's continuous memory was compared to that of her recovered memory, also raises questions about the study's controlling standards. Add. 33; *see* Daniel Brown et al., *Recovered Memories: The Current Weight of the Evidence in Science and in the Courts*, 27 J. Psychiatry & L. 5, 74 (1999) (explaining that the participants in the 1996 study "served as their own controls").

[11] The record before us includes Dr. Hopper's trial testimony, which was not before the District Court during the *Daubert* hearing. Working from a cold record, and without the benefit of live testimony, we will utilize Dr. Hopper's trial testimony in considering its reliability and fit. *See UGI Sunbury*, 949 F.3d at 831; *Elcock*, 233 F.3d at 746.

**B.**

An expert's testimony "fits" the proceedings, if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see UGI Sunbury*, 949 F.3d at 835. "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591. "This condition goes primarily to relevance," *Karlo*, 849 F.3d at 81 (quoting *In re TMI Litig.*, 193 F.3d at 663), so an expert's "testimony will be excluded if it is not scientific knowledge *for purposes of the case*," *UGI Sunbury*, 949 F.3d at 835 (quoting *Paoli II*, 35 F.3d at 743).

Dr. Hopper's testimony that "freely recall[ed]" memories are "85 to 95 percent accurate" does not fit the facts here. App. 1652. Ms. Cohen did not testify that she recalled any memories of abuse because of someone else's questions. Indeed, she never "remember[ed] an incident of abuse because of something" her therapist said. App. 1355. Rather, Ms. Cohen "would be going about the community" and experience "emotional sensations and physical sensations" that she would then "have to try to figure out." App. 1354. But those instances of recollection are not emblematic of "free recall."

Nor is Dr. Hopper's general theory of memory repression applicable to this case. He testified that abuse victims repress memories "because to relive [them] is going to evoke emotions that are going to make it harder for [the victim] to connect with and survive with the caregiver." App. 1641. But rather than try to "connect with" Mr. Cohen, App. 1641, Ms. Cohen testified that she was "disgusted and revolted by him," App. 1351, and had "hated [her] father since [she] was four years old," App. 1439. Indeed, Ms. Cohen "didn't want to be around [Mr. Cohen]," "didn't want to spend time with him," and "would throw horrible tantrums" to avoid being with him. App. 1345.

In sum, Dr. Hopper's testimony lacked reliability and fit, contravening the requirements of Rule 702. The District Court erred in failing to analyze these core components before admitting his testimony.

## C.

An evidentiary error is harmless "when it is highly probable that it did not prejudice the outcome." *United States v. Scarfo*, 41 F.4th 136, 174 (3d Cir. 2022) (quoting *United States v. Schneider*, 801 F.3d 186, 200 (3d Cir. 2015)). The District Court's admission of Dr. Hopper's testimony was prejudicial.

During closing argument, Ms. Cohen's counsel contended that although Ms. Cohen could "be mistaken in some of the details," Dr. Hopper's testimony made clear that "the central details of what happened, are strong and accurate" with "maybe as much as 90 percent accuracy." App. 1699–700. On this record, we cannot conclude that "the error did not affect the jury's verdict." *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 228 (3d Cir. 2008); *see Barker v. Deere & Co.*, 60 F.3d 158, 165 (3d Cir. 1995) (finding prejudicial error in admission of improper evidence in part because plaintiff's "opening statement and closing argument contained references to" the improperly admitted evidence). Accordingly, we must vacate the judgment and remand for a new trial.

\* \* \*

The District Court abused its discretion in admitting Dr. Hopper's testimony without analyzing its reliability or fit and the admission caused prejudicial error. So we will vacate the judgment and remand for further proceedings.